S89A0429. BEADLES v. THE STATE.
(385 SE2d 76)

MARSHALL, Chief Justice.

The appellant, Ricky Eugene Beadles, as well as Ronnie William Moon and Jackie Lamar Hill, was indicted on two counts of murder, one count of arson, and one count of burglary.

The appellant was the first indictee to stand trial. Co-indictee Hill pleaded guilty to the offenses charged, and he testified against the appellant.

Although the state sought imposition of the death penalty, at the sentencing phase of the trial the jury did not find the aggravating circumstances to be supported by the evidence, and the appellant was given two consecutive sentences of life imprisonment for the murder convictions. He was given a consecutive sentence of twenty years for the arson conviction and another consecutive sentence of twenty years for the burglary conviction.

He appeals. We affirm.[1]

The evidence established the following:

The victims were Garfield Williams and Wilbert Cammon, who was also known as William Campbell. Cammon rented a room in a house owned by Williams. At approximately 11:00 p.m. on December 23, 1987, the bodies of both Williams and Cammon were discovered in Williams' house. Both of them had been beaten severely and had sustained gunshot wounds. The house had been burned, and, to varying degrees, both of the decedents had sustained burn wounds.

Eyewitness testimony placed the appellant and his two co-indictees in the vicinity of the victims' residence, walking away therefrom, at approximately 10:30 p.m. on December 23rd.

The fire department was summoned after neighbors observed that the house had been set on fire. When the fire department arrived, the house was in disarray; two interior doors had been removed from their hinges; a window pane had been broken in the front of the house; a padlock had been forcibly removed from Williams' bedroom door; and a tire iron, ax handle, and the cartridge case of a .38 caliber handgun were found on the floor inside the house, as were two separate pools of blood.

A fire marshal who was called to the scene determined that fires in the house had been set intentionally.

There was testimony that Williams was a paraplegic, and that he kept checks and cash in his house, as did Cammon. In addition, Williams owned a .38 caliber handgun, and Cammon owned a .25 caliber automatic pistol. A witness testified that, shortly after Williams' murder, the appellant gave the witness a handgun identified as Williams' gun.

On the day following the murders, the police located the appel-

---

[1] The crimes in this case were committed on December 23, 1987. The trial commenced on January 11, 1989. Sentences were imposed on January 29, 1989. The motion for new trial, as amended, was denied on May 30, 1989. The notice of appeal was filed on June 21, 1989. The appeal was docketed in this court on August 15, 1989. The case was submitted for decision on September 29, 1989.

lant and his two co-indictees, who agreed to submit to questioning. A knife in the appellant's possession at the time he was taken in for questioning was consistent with the knife wound suffered by Cammon.

Although the appellant initially denied any involvement in the commission of the crimes, he admitted complicity therein upon being questioned in regard to blood on his clothing and a bullet wound to his finger. Afterward, he made one oral statement, and two taped statements, to the police.

In these statements, the appellant gave the following description of his involvement in the criminal enterprise: The idea of robbing the victims originated with co-indictee Hill. The appellant, Hill, and Moon approached the house. Hill knocked on the door and window. Williams then appeared at the door and began shooting, at which point the appellant was shot in the hand. Hill grabbed the victim and forced him inside the house. The appellant, who had run across the street, later heard gunshots. When he entered the house, the victims were dead. The appellant and his two co-indictees took the money and left. The appellant maintained that he did not see any guns, and that he did not know how the fire was started.

Co-indictee Hill, who pleaded guilty to the charges against him, gave the following testimony at the appellant's trial: It was the appellant's idea to rob the victims, and it was the appellant who forced entry into the house, after which the appellant and Cammon began to struggle. After Hill and Moon subdued Cammon, the appellant took his gun, and he began to exchange gunfire with Williams, who was in his bedroom. The appellant then kicked in the door to Williams' bedroom, entered the bedroom, and wrestled Williams from his wheelchair. Afterward, the appellant killed Cammon, and Moon killed Williams. The appellant was the last one to leave the house, and Hill did not know how the fire got started.

After his arrest, Hill led the police to the .22 caliber automatic pistol and the .38 caliber cartridges.

Medical testimony established that Cammon had extensive bruises to the face, head, chest, and neck. He also had sustained multiple rib fractures, stab and laceration wounds on his face, bodily damage from smoke and heat, and a broken neck. A gunshot wound on the right side of the head, which was consistent with a .38 caliber bullet, was determined to be the cause of death.

Williams had sustained similar injuries, and gunshot wounds on the right side of his head were also determined to be the cause of his death. Two .38 caliber projectiles were recovered from his skull.

A firearms examiner testified that bullets recovered from the crime scene were consistent with those fired from the .38 caliber handgun in the appellant's possession after the crimes were commit-

ted.

A forensic serologist from the state crime laboratory testified that she had examined samples of blood drawn from the co-indictees and the victims, as well as samples of blood found on articles of clothing worn by the co-indictees.

These blood samples were tested in order to determine their international blood grouping, which is either type A, B, AB, or O. And, through a process known as electrophoresis, the blood samples were further classified and differentiated according to enzyme systems, where the amount of blood contained in the blood sample was sufficient to employ this scientific technique.

Decedent Williams' international blood group was type A, and decedent Cammon's blood group was type B. Co-indictee Hill's blood is type A, and both the appellant's and Moon's blood group is type B.

Through electrophoresis, the state crime laboratory was able to distinguish between the enzyme profiles of Cammon, the appellant, and Moon. Cammon and the appellant have the same enzyme profile. Moon's is different.

Various items of clothing belonging to the appellant were also tested. Blood matching the blood grouping and enzyme profile of both Cammon and Williams was found on clothing worn by the appellant. Although blood matching the blood grouping or enzyme profile of decedent Cammon was found on items of clothing worn by other co-indictees, the appellant was the only indictee with blood on his clothing matching that of decedent Williams.

Additional evidence will be further reviewed insofar as is necessary for a resolution of the issues raised.

1. In his first enumeration of error, the appellant argues that the evidence is insufficient to authorize a rational trier of fact in finding the appellant guilty beyond a reasonable doubt of the crimes charged.

We hold that this enumeration of error is patently nonmeritorious.

The evidence authorized any rational trier of fact to find beyond a reasonable doubt that the appellant was a party to a criminal project having as its object the burglary of the victims' residence, so that, even if the appellant was not the actual perpetrator of the arson and the murders, those offenses would be imputable to him as an accomplice or co-conspirator. *Van Huynh v. State,* 258 Ga. 663 (1) (373 SE2d 502) (1988); *Williams v. State,* 251 Ga. 749 (4) (312 SE2d 40) (1983).

And, in addition to co-indictee Hill's direct testimony, the blood-analysis evidence reviewed earlier in this opinion constitutes highly probative circumstantial evidence identifying the appellant as an actual perpetrator of murder in this case.

2. In his second enumeration of error, the appellant complains of

the trial court's refusal to allow the defense to introduce the testimony of a defense witness in order to establish that co-indictee Moon, and not the appellant, was the actual perpetrator of the murders.

Upon making a proffer of evidence by the defense, it was established that this witness would testify that, while he was lying on his bed in his residence, an individual broke into his house. The witness could identify this individual by the sound of his voice, and the witness identified him as co-indictee, Ronnie Moon. Moon broke into the witness' house, placed a stick across his throat so as to choke him, stole his wallet, and then fled. The witness did not receive any bone fractures, nor did he seek medical attention.

The medical examiner had testified previously that although neither Cammon nor Williams was strangled, they both suffered from similar neck fractures, described by the medical examiner in the following manner: The front vertebrae of the neck were fractured, which is "highly unusual," and is generally seen in cases of whiplash arising from car accidents. This type of bodily injury could have been accomplished by the perpetrator's hitting the victims on the back of the head with sufficient force to cause a "whipping action," or by manipulating the neck in such a way as to cause such a fracture, or by putting his knee under the person's chin or neck so as to cause this fracture.

After extensive discussions with counsel, and after reviewing the medical examiner's testimony as well as the proffer of evidence by the defense, the trial court ruled that sufficient factual similarity did not exist between the extrinsic crime and the crime perpetrated in this case, in that the extrinsic crime was "highly unusual," involved a "whipping action of the neck," and "indicated that the assailant probably had some knowledge of anatomy," whereas the neck injuries in the present case constitute "common garden-variety choking."

In addition, the state's evidence established gunshot wounds to the head as the cause of the victims' deaths, rather than neck injuries or strangulation.

At trial and on appeal, it is the appellant's contention that since, under certain circumstances, similar-crimes evidence can be admitted by the state in order to establish the defendant as the perpetrator of the crime charged, see, e.g., *Hamilton v. State*, 239 Ga. 72 (235 SE2d 515) (1977), by a parity of reasoning, the defense should have been allowed to introduce evidence of the extrinsic crime here, in order to establish that, as between the various parties to these crimes, the party who actually committed the murder was an accomplice of the appellant, and not the appellant himself.

However, as held in Div. 1, supra, the evidence authorized the appellant's convictions with respect to all indicted offenses, regardless of whether or not he was found to be the actual perpetrator of the

murders.

Consequently, although facts could be hypothesized under which evidence of similar crimes committed by a third party is arguably relevant to a defense that the accused did not commit the crime charged, see *Commonwealth v. Rini*, 427 A2d 1385 (Penn. 1981); Daniel, Georgia Handbook on Criminal Procedure, § 1-24 (1986), we hold that under the facts of this case, the trial court did not abuse its discretion, or commit harmful or reversible error, in ruling that evidence of the extrinsic crime allegedly committed by an accomplice of the appellant was not relevant in the guilt/innocence phase of this murder trial. See generally *O'Neal v. State*, 254 Ga. 1, 3 (2) (325 SE2d 759) (1985); *Baker v. State*, 246 Ga. 317 (3) (271 SE2d 360) (1980).[2]

3. In his third and final enumeration of error, the appellant argues that the trial court improperly curtailed his cross-examination of his accomplice, Jackie Lamar Hill.

The prosecutor's respective objections to defense counsel's questioning of this witness were sustained on grounds that questions were argumentative; that they misstated the witness' testimony; that they were stated in such a way that they were not intended to elicit responses on the part of the witness; and that they assumed facts not in evidence.

Upon a review of the record, we hold that the trial court did not abuse its discretion in ruling that defense counsel's questioning of the witness was objectionable, for the reasons stated above. E.g., *Ruffin v. State*, 243 Ga. 95 (16) (252 SE2d 472) (1979).

In addition, to the extent that the appellant contends that, in rendering the foregoing rulings, the trial court made improper comments in the presence of the jury, the appellant made no objection in regard thereto at trial and is thus precluded from raising the issue on appeal. E.g., *Brand v. State*, 258 Ga. 378 (3) (369 SE2d 896) (1988).

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 1, 1989.

---

[2] Evidence establishing an accomplice, rather than the accused, as the actual perpetrator of a murder is, of course, relevant at the sentencing phase of a death penalty case such as this. See *Green v. State*, 242 Ga. 261 (14) (249 SE2d 1) (1978), rev'd on other grounds, *Green v. Georgia*, 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979). Here, the trial court did allow this evidence as to co-indictee Moon to be introduced at the sentencing phase of this trial.

However, under our disposition of this enumerated error, we do not reach the question of whether there was sufficient factual similarity between the extrinsic crime and the crimes in this case, so as to warrant admission of evidence of the extrinsic crime by the defense under the criterion employed in cases exemplified by *Hamilton v. State*, supra, that proof of the extrinsic crime tends to prove the crime under consideration here.

*Kennedy & Kennedy, Reid W. Kennedy,* for appellant.

*Thomas J. Charron, District Attorney, Debra H. Bernes, Assistant District Attorney, Michael J. Bowers, Attorney General, C. A. Benjamin Woolf,* for appellee.