## A91A0807. EVANS v. THE STATE.
### (410 SE2d 146)

BEASLEY, Judge.

Following the denial of his motion for new trial, Evans appeals his convictions of 19 counts; five counts of rape, OCGA § 16-6-1 (a), five counts of aggravated sodomy, OCGA § 16-6-2 (a), six counts of armed robbery, OCGA § 16-8-41 (a), one count of theft by taking a vehicle, OCGA § 16-8-2, and two counts of burglary, OCGA § 16-7-1 (a). The crimes for which he was tried and convicted occurred serially over a period of approximately 39 days and involved eight victims.

The evidence construed in favor of the verdicts showed the following pattern of criminal activity.

### February 29, 1988

As A. W. was readying to go to work, she noticed that the door to the basement of her apartment building was ajar. As she attempted to close the door, a man hiding inside put a foot-long "boning" knife to her throat and told her to be quiet. The man forced A. W. to go back upstairs to her apartment; he told A. W. he had been watching her and he asked if she lived alone and if anyone was in the apartment. The man threw A. W. face down on her bed and "hogtied" her hands and legs together with ropes he had brought with him in a gym bag. A. W.'s head was sideways and she could see the man walking around. He threatened to cut A. W.'s head off, told her he had a gun, and lifted his sweater and showed her what appeared to be a holster with a gun butt sticking out.

Dissatisfied with the lack of property and money in A. W.'s apartment, the man began to untie, rearrange A. W., and remove her clothes so that he could sexually assault her. A. W. tried to talk him out of the attack by lying that she had a sexually transmitted disease. The man forced A. W. to perform oral sex on him, then donned a condom and raped her; he asked A. W. if she ever had a black man before and told her that she was really going to enjoy it.

Following the attack, the man unhooked a VCR and rummaged through a jewelry box. He again raped A. W. and forced her to perform oral sex on him. The man then re-hogtied A. W., gathered up some valuables including a ring off A. W.'s finger, and began to take them downstairs. He also took A. W.'s bank card and car keys. Believing the man had gone, A. W. worked the gag out of her mouth. The man returned indicating he could not drive A. W.'s car because it was a manual transmission. Noticing that A. W.'s gag had been removed, the man got angry and resecured the gag with one of A. W.'s belts. He then ate some food that A. W. had wrapped for lunch and left.

A. W. was able to describe her assailant and helped with a com-

posite sketch of him the day after the attack. Even though A. W. was unable to pick out appellant at a lineup three months after the attack, at trial she positively identified appellant as her assailant from her memory of the attack.

### March 4, 1988 (Similar Transaction)

Just after K. D. hung up the telephone in her university dorm room, she was grabbed from behind by a tall black man wielding a long curved knife. The man put the knife to K. D.'s neck and made her lie down on the floor. He put a burlap gag in her mouth secured with a belt, tied her hands behind her back, tied a necktie around her neck and blindfolded her; the man had brought all of the bindings with him. He undressed K. D. and asked her for her bank card. K. D. could hear the man moving around the room and a duffel bag of some sort that he had brought with him unzip. The man then performed oral sex on K. D. and raped her. He then continued to rummage through the room looking for jewelry and other valuables. K. D. told the man that her roommate was going to be back soon and he responded, "Well, good, then I'll have two of you . . . I've done this three times already. . . ." The man then left saying that he would come back.

Although K. D. never saw her assailant, another student observed K. D. returning to the dormitory just prior to the attack and saw a black man enter the dormitory in a suspicious manner. The student called police to report it. The student later described the man to a police artist who drew a likeness close to what the student had seen.

### March 8, 1988

M. W. G. and D. S. were housemates; D. S. was a college student receiving room and board in exchange for caring for M. W. G.'s child. D. S. had just returned home from class when a man rang the door bell and asked for a house number. The man was carrying a large brown duffel bag. D. S. told the man she did not know the house number and as she began to close the door, he pushed the door open and grabbed her around the neck from behind while wielding a long knife. He forced her into a back bedroom, made her lie on the bed, and asked for money. He tied up D. S. with a telephone cord and blindfolded her. The man then unsuccessfully searched the house for valuables. He told D. S. that since he could find nothing, he was going to have to "take" her. Putting a knife to her neck, he forced D. S. to perform oral sex on him and then raped her.

M. W. G. stopped by her house following a mid-afternoon appointment. As she was at the top of the stairs, she noticed a reflection in the glass of a hanging picture and called out to D. S. The man

came from behind the door wielding a knife. M. W. G. ran down the stairs but tripped and fell. The man forced her upstairs into the bedroom where D. S. was lying across the bed, tied up and nude from the waist down. The man forced M. W. G. to lie down next to D. S.; he then tied her hands behind her back with a telephone cord and blindfolded her. The man asked for jewelry and money and threatened to "cut" or kill M. W. G. and kill her child if she called police.

The man rolled D. S. over and raped her. He then began to undress M. W. G. but upon discovering that she was menstruating, abandoned his attack on her and again raped D. S.

Both women were tied in a "bowed" position. The man again searched the house looking for jewelry and other valuables. He took the rings off M. W. G.'s fingers. The man stated that he "hated doing this to sisters, because he thought that it was a home where white people lived." He came back into the bedroom several times and then drove away in M. W. G.'s car.

The day of the attacks, a neighbor had seen a black man carrying a duffle bag follow D. S. off the bus as she was returning from class. The man resembled one of the composite drawings.

Also the day of the attacks, a man who gave his name as Randle Evans and who presented a Texas driver's license as identification, pawned jewelry belonging to A. W., K. D.'s roommate, M. W. G., and D. S. The pawn shop clerk identified appellant at trial as the man who pawned the jewelry. Appellant's fingerprint was found on a pawn ticket from another shop by a Randle Evans.

Two months after the attacks, M. W. G. picked appellant out of a lineup. She also identified him at trial as the assailant.

### March 31, 1988

A. R. rode the bus to her apartment in the afternoon and had been home about 15 minutes when a man knocked at the door asking for a person at a particular apartment number. A. R. told the man that she did not know the person or the number and closed and locked her door. About two minutes later, the man knocked again and asked to use the telephone. A. R. said she would make the call for the man and closed the door but did not lock it; she tried the number several times but got no response. The man cracked open the door and asked her to try one more time. A. R. tried the number unsuccessfully one more time and told the man that someone was playing a joke on him. He came into the apartment, pulled a knife and told A. R. the joke was on her.

A. R. started screaming and the man put the knife to her neck and told her to shut up or he would cut her neck. He pulled A. R. to her room, asked for money, tied her with a telephone cord face down

on the bed and gagged her. He went through her purse and asked for a bank card and its secret code. The man asked A. R. if anyone else lived there and A. R. responded that her roommate would be coming home. After about five minutes, A. R.'s roommate M. D. came home.

The man met M. D. in the hallway, put a knife to her throat, and threatened to cut her if she made noise or looked at him. He forced her into the room where A. R. was, tied her hands and ankles, asked for money, and took her ring off. He undressed both women. The man forced A. R. into the other bedroom, hogtied her, and threatened to cut her throat or kill her. He returned to M. D., untied her hands and feet, and performed oral sex on her and raped her. He then retied her.

The man went back to A. R. He performed oral sex on her and raped her. He retied her and then returned to rape her again. He took A. R. back into the room with M. D. He stated he had a gun and showed the handle to what looked like a gun in his pants. As he prepared to leave, he retied the women, telling them that he would not tie them in the back since he tied only the white women that way.

When the assailant had entered the house, he had brought with him the briefcase of M. W. G., who had been raped three weeks earlier.

A. R. picked appellant's picture out of a photographic lineup. M. D., who had been instructed by the assailant not to look at him, narrowed her choice to two photographs, one of which was appellant's. A. R. also helped create a composite sketch of the attacker and identified appellant at trial as the assailant.

### April 6, 1988

C. B. ran out of her apartment to try to give the friend who had just left the coat she had forgotten. As she walked back to her apartment, a man came up behind her, put a knife to her face, and told her that if she screamed, he would cut her head off. He forced her back into her apartment and made her put her face down on the bed and not look at him. He asked for money and a bank card. After getting only a very small amount of money, he cut the telephone cord and tied C. B.'s hands behind her. He asked for jewelry and took a diamond ring off C. B.'s finger. He put a towel over C. B.'s face and took her skirt off. He untied her hands and told her that if she screamed, he would shoot her head off; he had a gun on his belt. The man told C. B. that she knew what he had to do because she did not have any money. He then performed oral sex on C. B. and raped her.

The man allowed C. B. to get up and go in the bathroom. He began to chat with her and told her he was from Houston, Texas.

C. B. identified appellant as her attacker from a lineup, at the preliminary hearing, and at trial. Appellant's fingerprints were taken

from C. B.'s apartment the night of the attack.

*April 7, 1988*

In the evening, when C. B.'s neighbors, Beavers and Bryant, returned to the apartment complex, Beavers realized that her apartment had been broken into. They called the police. While an officer was in Beavers' apartment with her, Bryant was on the porch and Bryant saw someone two doors down lean out, look in her direction, and then lean back. After the officer left, the women called the apartment manager to come and fix Beavers' front door, which had been kicked in. While they waited for the manager, Bryant noticed someone walk up to Beavers' door. Thinking it was the maintenance man, Bryant opened the door and an unknown man was standing there. The man jumped back, turned, and started to run. He stopped, came back on the stairs, and commented that someone had broken in and that the same thing happened to him, two doors down. Wanting to get him away from the door, Bryant told the man that the police were around the corner and could take a look at his place. When he left, Bryant called the police.

Bryant described the man to the officer and indicated the direction he had gone. Shortly, the officer returned with a suspect and Bryant identified him as the man who had come to the door. The man carried a Texas driver's license bearing the name Randle Mitchell Evans. Shoeprints found on Beavers' door matched the soles of shoes appellant was wearing when he was apprehended.

The arresting officer had been the officer who responded to C. B.'s call the night before. The officer observed that appellant fit the description of the attacker given by C. B., including that the assailant had indicated he was from Texas. The officer took appellant and the property he was carrying to the sex crimes office.

The property found on appellant included that belonging to M. W. G., knives, which fit the descriptions of those used in the sexual attacks, a screwdriver, approximately $33 in change, and a Walkman-type stereo with earphones belonging to another resident of the apartment complex, Gourdine.

Gourdine's apartment was two doors down from that of Beavers and had been burglarized the night of C. B.'s attack. Gourdine's door had been pried open with a tool consistent with the markings of a screwdriver. Items missing from Gourdine's apartment included a coin box full of change and the Walkman-type radio.

1. Enumeration 1. Appellant contends that the trial court erred in consolidating for trial the five rape charges as well as joining the two burglary charges. Appellant had moved to sever the indictments on the bases that the charged conduct was not part of a single plan

and that joint trial would result in prejudicial complexity of the evidence.

" 'In *Dingler v. State*, 233 Ga. 462 (211 SE2d 752) (1975), (the Supreme C)ourt adopted ABA Standards of severance which provide that a defendant is entitled to severance if offenses are joined simply because they are similar in nature.' *Cooper v. State*, 253 Ga. 736 (3) (325 SE2d 137) (1985). However, '(o)nly when the offenses have been joined *solely* because they are of the same or similar character shall the accused have a right to severance of the offenses (Cits.)' *Jordan v. State*, 172 Ga. App. 496 (1) (323 SE2d 657) (1984). Offenses are not joined *solely* because they are of the same or similar character where the similarity reaches the level of a pattern evincing a common motive, plan, scheme or bent of mind. *Cooper v. State*, supra at 737. ' "Where the modus operandi of the perpetrator is so strikingly alike, that the totality of the facts unerringly demonstrate and designate the defendant as the common perpetrator, the offenses may be joined — subject to the right of the defendant to a severance in the interests of justice. (Cits.)" ' *Jordan v. State*, supra at 497. '(S)ever[a]nce in this particular kind of circumstance lies within the sound discretion of the trial judge. . . .' *Dingler*, supra, 233 Ga. at 463." *Wilson v. State*, 188 Ga. App. 779, 780 (1) (374 SE2d 325) (1988).

The rape charges against Evans were not joined solely because they constituted the same sexual offense but because the manners in which the crimes were committed were so similar as to reveal a common modus operandi pointing to the defendant/appellant as the perpetrator. The State not inaccurately describes the crimes as "signature rapes." The interests of justice were not disserved by joinder of the rape charges as opposed to their severance. As in *Cooper v. State*, supra at 737, "[the] facts and circumstances authorized the trial judge to conclude that [Evans'] bent of mind was such that the offenses 'constituted parts of a single scheme or plan.' " Denial of severance and permitting joinder of these charges was not an abuse of discretion.

Nor was there abuse in joining the burglaries for trial. These crimes were part and parcel of appellant's crime spree in the apartment complex where he raped and sodomized C. B. They were also part of his continuing pattern of theft of personal property.

2. Enumeration 8. Appellant contends that the trial court erred in permitting the chief investigator to remain in the courtroom during the trial, over objection and despite a request for sequestration.

The trial court did not abuse the discretion it has to make exception to the sequestration rule to permit an investigating officer to remain in the courtroom throughout trial in order to aid in the presentation of the State's case. See *Norman v. State*, 255 Ga. 313, 316 (3) (338 SE2d 249) (1985); *Edwards v. State*, 171 Ga. App. 264, 265 (1)

(319 SE2d 101) (1984).

3. Enumeration 5. Appellant contends that the trial court erred in denying his motion to exclude evidence of pre-trial lineup identification by two of the victims. He maintains that the evidence was inadmissible because he was denied his Sixth Amendment right to counsel at the lineups even though he had requested that an attorney be present. Appellant does not pursue an independent state ground, constitutional or otherwise, so only the federal right is at issue.

The lineups occurred before the indictments were returned. " ' " 'There is no [federal] constitutional right to counsel at a pre-indictment lineup. (Cits.)' " (Cits.)' *Fudge v. State*, 164 Ga. App. 392, 393 (3) (297 SE2d 329) (1982)." *Johnson v. State*, 198 Ga. App. 316 (2) (401 SE2d 331) (1991). Exclusion of the evidence was not required.

4. Enumeration 6. Appellant contends that the trial court erred by permitting an officer, in violation of OCGA § 24-3-2, to give damaging hearsay testimony linking stolen property to victims A. W. and D. S.

The essence of the testimony was that after appellant was arrested, appellant's uncle, with whom appellant lived, called a burglary detective to come to his house because the uncle was concerned that certain property which appellant had brought to the house was stolen. The detective discovered that the items were in fact stolen. Both A. W. and D. S. identified some items as theirs and both testified that their assailant had taken them.

The testimony by the detective describing the suspicion of appellant's uncle explained the detective's conduct in initially going to the defendant's uncle's house and in further investigating to determine whether or not the goods were indeed stolen. "Under OCGA § 24-3-2, conversations had in the course of a legal investigation may be admitted as original evidence to explain the conduct of a law enforcement official provided the conduct involves a matter relevant to the issue on trial. *Ivester v. State*, 252 Ga. 333, 335 (313 SE2d 674) (1984)." *Matthews v. State*, 194 Ga. App. 386, 387 (2) (a) (390 SE2d 873) (1990). The detective's testimony was admissible as original evidence under OCGA § 24-3-2, on the issue of defendant's connection to the stolen items.

5. Enumeration 7. Appellant contends the trial court erred by denying him the right to introduce defense testimony that very similar sex crimes had occurred and were investigated in connection with the indicted cases and that the victims of such crimes had been unable to identify appellant as the perpetrator. Appellant relies on *Beadles v. State*, 259 Ga. 519, 522-524 (2) (385 SE2d 76) (1989).

*Beadles* noted that "facts could be hypothesized under which evidence of similar crimes committed by a third party is arguable rele-

vant to a defense that the accused did not commit the crime charged, [cits.] . . ." Appellant failed to make any showing that the other crimes were similar in their manner of commission to those for which he was on trial. Nor did he show that someone other than himself committed the crimes charged. *Beadles* is thus distinguishable.

Appellant completely fails to point out where in the massive trial record the attempted proffer and the court's ruling is to be found. See Court of Appeals Rule 15 (c) (3).

The trial court did not err in excluding the proposed evidence.

6. Enumeration 9. Appellant contends that the trial court erred in permitting the State to recall a defense witness for cross-examination after granting the State a five-minute recess to confer with the witness.

The State is permitted to confer privately with its witness during a recess in the witness' testimony. See *Carter v. State*, 195 Ga. App. 489, 490 (1) (393 SE2d 746) (1990). Likewise, there is no prohibition against the State doing so with a defense witness. In addition, " '[i]t is always within the sole discretion of the trial court to permit either the State or the defense in criminal cases to reopen the case after the close of the evidence. (Cits.)' [Cit.]" *Boscaino v. State*, 186 Ga. App. 133, 134 (3) (366 SE2d 789) (1988). It follows that it is within the trial court's discretion to reopen cross-examination at the behest of the State.

Appellant further complains that he was severely harmed by prejudicial hypothetical questions asked of the witness by the State during the reopening of cross-examination. These complaints are not properly before the Court. First, "[e]numerations may not be enlarged by brief on appeal to cover issues not contained in the original enumeration. [Cit.]" *Newberry v. State*, 184 Ga. App. 356, 357 (1) (361 SE2d 499) (1987). Second, appellant now objects to the hypotheticals on a different basis than urged at trial. See *Brinson v. State*, 191 Ga. App. 151, 152 (2) (381 SE2d 292) (1989).

7. Enumeration 2. Appellant contends it was reversible error for the trial court to allow the evidence of the attack on K. D. as a similar transaction because there was no evidence that he was the perpetrator of the independent crime.

"It is well recognized that '(t)o render evidence of extrinsic offenses admissible for any of (the above) purposes, the State must show that the defendant was the perpetrator of the extrinsic offenses, and that there is a *sufficient* similarity or *connection* between the extrinsic offense and the offense charged, such that proof of the former tends to prove the latter.' (Emphasis supplied.) [Cits.]" *Crews v. State*, 185 Ga. App. 494, 495 (2) (364 SE2d 625) (1988).

Contrary to appellant's contention, there was evidence upon which the jury could base a finding that he was the perpetrator of the

independent crime. K. D. was attacked in the same manner as the other victims. She described her attacker as a "tall black man," and the jury was authorized to assess the student witness' description of the man entering the dormitory and the identification of a composite drawing of K. D.'s attacker as the man who followed D. S. from the bus prior to that attack. Jewelry stolen from the room was identified as that which defendant had pawned. All of this evidence circumstantially pointed to appellant as K. D.'s assailant even though she was unable to positively identify him. Compare *Stephens v. State*, 261 Ga. 467, 468 (6) (405 SE2d 483) (1991).

8. Enumeration 3 in appellant's brief. Appellant contends that the trial court erred in failing to give limiting instructions regarding the similar transaction.

Appellant made no such request to charge, so "he was not entitled to a limiting instruction either at the time the evidence of the similar [act] was admitted into evidence or in the general charge. [Cit.]" *Holloway v. State*, 187 Ga. App. 716, 718 (3) (371 SE2d 259) (1988).

Nevertheless, the trial court, sua sponte, gave extensive limiting instructions as part of its general charge: "specifically with regard to the testimony concerning the incident at [school] involving the victim [K. D.], I charge you that certain evidence has been presented in this case concerning alleged similar transactions by the defendant. With regard to all testimony about these alleged similar transactions by the defendant, I charge you that this defendant is on trial for the particular offenses charged in these bills of indictment that you will have out with you for your consideration and on no other charge or charges.

"He is not on trial on account of any other alleged offense or offenses and any evidence in this case with reference to any other alleged offense or offenses is admitted for the purpose of your consideration solely and only under the provisions of law that where knowledge, common design, modus operandi, motive, intent, good or bad faith, bent of mind, plan, scheme, course of conduct, identity or other matters dependent on a person's state of mind are involved as material elements in the offense for which he is on trial.

"Evidence of the defendant's conduct with reference to similar transactions is admitted solely for you to consider only as it might tend to illustrate the defendant's state of mind on the subject involved if you think it does so illustrate it and for that purpose alone. You are not to consider it for any other purpose.

"The court does not intimate or express to you any opinion whatsoever as to whether the defendant has had any other transactions at any time similar to the charges for which he is being tried in these bills of indictment or of his guilt or innocence on the charges contained in these bills of indictment.

"Whether the accused has or has not committed other similar offenses is a matter solely for your determination. However, if you believe that the accused has had similar transactions, you will bear in mind that in connection with any such evidence you are considering it solely with reference to the mental state, identity, or intent of the defendant insofar as the same is applicable to or refers to or illustrates the charges contained in these bills of indictment and for no other purpose."

These instructions adequately informed the jury about the limits in considering the evidence of the similar transaction, and did not, as appellant further maintains, imply that he was guilty of the similar transaction.

9. Enumeration 4 in appellant's brief. Appellant contends that the trial court erred by "coercing the jury to reach a verdict."

The complaint is about the court's closing comments to the jury: "Ladies and gentlemen, your verdict, as I told you before, must be unanimous. It must be agreed to by all twelve of you. It cannot be a majority vote. It has to be twelve to zero. It must be dated. *Today is the 23rd day of January, 1990. Hopefully it will still be that when you reach your verdict.* It must be in writing. And it must be signed by your foreperson. *When you have reached your verdict,* please write it down, knock on the door of the jury room or flip the switch in there, . . . *we'll send the sheriff out to open the door and let you out* and we'll publish the verdict in open court." What is underscored is particularly targeted by appellant.

The court's comment was not an *"Allen* instruction" or "dynamite charge." Even if it could be construed as a premature attempt at such, " '[t]he issue in reviewing such charge is whether the instruction is coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors.' [Cits.]" *Sanders v. State,* 257 Ga. 239, 243 (7) (357 SE2d 66) (1987).

Shortly after this comment, the court also instructed the jury that, "no juror is required to surrender an honest opinion merely for the sake of reaching a unanimous verdict if in their conscience, and pursuant in their oath as a juror, they honestly believe their opinion should not be changed."

The court's instruction taken as a whole was in no manner coercive.

*Judgment affirmed. Banke, P. J., and Carley, J., concur.*

DECIDED SEPTEMBER 3, 1991.

*Nancy M. Markle,* for appellant.
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Rebecca A.*

*Keel, Assistant District Attorneys*, for appellee.