## A00A1963. THE STATE v. LEDFORD.
### (543 SE2d 107)

ELDRIDGE, Judge.

The State appeals from the trial court's grant of Judy Ladean Ledford's motion to suppress three baggies of methamphetamine powder Hall County narcotics agents Casper and Neville found in Ledford's black fanny pack. In granting the motion to suppress, the trial court found that (1) Ledford was detained by the agents without reasonable, articulable suspicion; and (2) Agent Neville searched Ledford's fanny pack without consent. This Court will not disturb a trial court's findings on a motion to suppress if there is any factual basis to support the trial court's legal conclusions.[1] In this case, however, we find none and reverse.

The transcript of testimony at the motion to suppress hearing shows that two agents from the Multi-Agency Narcotics Squad (MANS) unit of the Hall County Sheriff's Department, Agents Casper and Neville, were on routine patrol in the Dawsonville Highway and Sardis Road area in Hall County. The sheriff's department had received numerous complaints of drug activity in and around the convenience stores in that area, so Casper and Neville were specifically observing the convenience stores and businesses along the highway.

The agents observed a green Mitsubishi pull beside a pay phone outside a local restaurant that shares a parking lot with a Circle M convenience store. A female, E. S., exited the car, got on the pay phone, stayed on for a short time, and then went back to her car to sit. The agents watched her do this two or three times over a fifteen-minute span. Agent Casper testified at the motion hearing that such conduct aroused his suspicion because "usually with drug activity, selling, a person will go to a pay phone, call somebody or page somebody and then sit and wait for them to bring the drugs."

Fifteen minutes later, a red Ford pulled up beside the Mitsubishi. Appellee Ledford got out of the Ford and into the Mitsubishi. Ledford and E. S. then drove through the parking lot to park in front of the Circle M. They exited the car and went into the convenience store; Ledford was carrying a black fanny pack. Together, Ledford and E. S. entered the single-person ladies room of the Circle M. Agents Casper and Neville waited outside the convenience store, but Ledford and E. S. did not reappear. Casper went inside the Circle M, bought a soda, and returned to the patrol car. The women did not leave the bathroom. Finally, Ledford and E. S. exited the ladies room; they left the Circle M and got back into the Mitsubishi. They drove back across the parking lot to the red Ford, where E. S. parked the

[1] *State v. Henderson*, 271 Ga. 264 (517 SE2d 61) (1999); *State v. Bowen*, 231 Ga. App. 95 (498 SE2d 570) (1998).

Mitsubishi and let Ledford out. At that point, Casper and Neville walked up to the two women. The agents did not question them; instead, Casper immediately asked E. S. if he could search her person, and E. S. consented to such search. At the same time, Neville asked Ledford if he could search her person, and Ledford, too, consented to be searched. Casper asked E. S. if he could search her purse, and she consented. Neville then asked E. S. if he could search the Mitsubishi, and "[s]he stated that was fine." Agent Casper testified on direct at the motion to suppress that

> Agent Neville went around to the passenger side of the car, opened up the passenger door. I went to the driver side of the car and opened up the driver side door and I started searching, he started searching. There was — the black fanny pack was laying [sic] in the car. Agent Neville asked [E. S.] if it belonged to her. She stated no, that it was not hers. He asked Ms. Ledford if it belonged to her, she stated no, that it did not belong to her. At that time he opened it and reached in it and at that time Ms. Ledford pushed him aside and said, "No," and grabbed the purse out of his hands. . . . At that point she stated it was hers. . . . Agent Neville went ahead and put her in handcuffs and said, "If you'll look in the bag there's methamphetamine in there." At that time, I opened the bag. I believe there were some tissue which was wrapped around three plastic baggies of methamphetamine powder.

During cross-examination, Agent Casper reiterated this sequence of events. Ledford did not testify at the motion hearing, and no further evidence was introduced. There was no challenge to the voluntary nature of the consent to search obtained by the agents.

1. The trial court found (a) that Agents Casper's and Neville's multiple requests to search elevated the agents' actions to that of a *Terry*[2] detention, and (b) that the agents' actions were not supported by the requisite reasonable articulable suspicion necessary to support such detention. We find that the evidence of record does not support either of the trial court's legal conclusions.

(a) In Georgia, we recognize three levels of police-citizen encounters:

> In the first level, police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal

---

[2] *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. This tier provides no Fourth Amendment protection. The second tier occurs when the officer actually conducts a brief investigative *Terry* stop of the citizen. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity. The third tier of police-citizen encounters includes full-scale arrests that must be supported by probable cause.[3]

Here, the only evidence of record shows that the Mitsubishi was already stopped when the agents walked up to Ledford and E. S. The agents asked for multiple consents to search. The two women voluntarily consented to each search requested. That is the extent of the evidence prior to Ledford's arrest. And in that regard, "[i]t is well established that an officer's approach to a stopped vehicle and inquiry into the situation [are] not a stop or seizure but rather clearly fall[ ] within the realm of the first type of police-citizen encounter."[4] Further, we have found that requests to search made during the course of a first level police-citizen encounter do not transform such encounter into a second tier *Terry* stop: "it is clear that merely requesting consent for a search is not a seizure and does not require articulable suspicion."[5]

There is no evidence — *or claim* — of coercion or force in this case that would negate either the propriety of the agents' requests to search or the voluntary nature of the consent received. And "[o]nce a voluntary consent is legally obtained, it continues until it either is revoked or withdrawn."[6] Accordingly, there is no evidence in the record that the agents' approach of the two women was a *Terry*-type detention that required reasonable articulable suspicion. The trial court's finding to the contrary, based *solely* on the fact that multiple requests to search were made, is erroneous.

(b) Moreover, even under a *Terry* analysis, the agents' actions in this case were proper since there was ample reasonable articulable suspicion of criminal activity to support a brief investigative detention.

---

[3] (Citation and punctuation omitted.) *State v. Burks*, 240 Ga. App. 425, 426 (1) (523 SE2d 648) (1999).

[4] (Punctuation omitted.) *Stokes v. State*, 238 Ga. App. 230, 232 (518 SE2d 447) (1999); *Voyles v. State*, 237 Ga. App. 886, 887 (517 SE2d 113) (1999).

[5] *Stokes v. State*, supra at 232; *Voyles v. State*, supra at 887.

[6] (Citation omitted.) *Calixte v. State*, 197 Ga. App. 723, 726 (399 SE2d 490) (1990).

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like articulable reasons and founded suspicion are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.[7]

Accordingly, momentary detention and questioning are permissible if based upon specific and articulable facts, which, taken together with rational inferences from those facts, justify a reasonable scope of inquiry not based on mere inclination, caprice, or harassment. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was neither arbitrary nor

---

[7] (Citations and punctuation omitted.) *Evans v. State*, 183 Ga. App. 436, 438-439 (359 SE2d 174) (1987), citing *United States v. Cortez*, 449 U. S. 411, 417-418 (101 SC 690, 66 LE2d 621) (1981).

harassing.[8] The principal components of a determination of reasonable suspicion will be the events which occurred leading up to the stop or search and then "the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."[9]

In this case, Agent Casper testified that he had worked on the MANS unit of the Hall County Sheriff's Department for two years. The area in which the incident occurred had been repeatedly reported to the sheriff's department as a high drug crime area, Dawsonville Highway and Sardis Road.[10] The locale in which the incident occurred had been reported as a favored locale for drug crime, i.e., a convenience store. E. S.'s and Ledford's actions were consistent with the actions of those involved in buying and selling drugs. Upon meeting, the women's subsequent actions were suspicious to the officers: the women met at a pay phone in a parking lot; Ledford then left her car and got into E. S.'s car only to drive across a parking lot; they entered the Circle M's single-person bathroom together; they remained together in the bathroom for a long time; and E. S. then drove Ledford back across the parking lot only to let her out at Ledford's car in order to part company. Such actions demonstrated no purpose for meeting, other than to drive together across a parking lot to go to the bathroom at a convenience store. While such conduct may be susceptible to an innocent explanation, it is also consistent with drug sale activity:

> [C]ourts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. . . . All of this conduct was by itself lawful, but it also suggested that the individuals were [engaged in a drug transaction]. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity. In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The

---

[8] *State v. Stansbury*, 234 Ga. App. 281, 283 (505 SE2d 564) (1998).

[9] (Punctuation omitted.) *Freeland v. State*, 223 Ga. App. 326 (477 SE2d 633) (1996), citing *Ornelas v. United States*, 517 U. S. 690 (116 SC 1657, 134 LE2d 911, 919) (1996).

[10] See *Illinois v. Wardlow*, 528 U. S. 119 (120 SC 673, 675-676, 145 LE2d 570) (2000).

*Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.[11]

Here, given the lack of apparent purpose for the women's actions; the consistency such actions had with drug sale activity; the fact that such actions occurred in a known drug crime area; and the fact that such actions occurred at what had been reported as a frequent drug crime locale, we find the evidence provides sufficient reasonable articulable suspicion to support a brief detention of the women in order to determine what was going on.[12]

2. The trial court found that Agent Neville improperly searched Ledford's fanny pack without consent. The trial court concluded that:

Officer Casper testified that as Officer Neville prepared to search the pack, "Ms. Ledford pushed him [Officer Neville] aside and said no and grabbed the purse out of his hands [and] [a]t that point she said it was hers." Thus the Court does not believe that it is possible for Officer Neville not to have known the Defendant was asserting her ownership and did not consent to have the pack searched, *nevertheless, Officer Neville proceeded to search the pack*. Based on the foregoing, the Court finds that, the search of the fanny pack without the benefit of consent or a warrant, was illegal.[13]

The evidence of record, however, does not support the trial court's factual conclusion that Neville "proceeded to search the pack" *after* Ledford asserted an ownership interest in it.

It is undisputed that Ledford had initially disclaimed ownership of the pack when Agent Neville picked it up, and she cannot claim a legitimate expectation of privacy in the pack during the time she had "abandoned" her ownership of it.[14] Yet, it is also undisputed that Ledford ultimately asserted her ownership of the fanny pack by grabbing it out of Agent Neville's hands and refusing consent to search. The issue here, then, is whether Neville discovered the methamphetamine before Ledford grabbed the pack from him, i.e., while it was still "abandoned" and Ledford's consent to search was irrelevant. The sole evidence on this issue is as follows:

---

[11] (Citations omitted.) Id., 120 SC at 676-677.

[12] *Thompson v. State*, 230 Ga. App. 131, 132 (495 SE2d 607) (1998).

[13] (Emphasis supplied.)

[14] *Orman v. State*, 207 Ga. App. 671, 672 (428 SE2d 813) (1993); *Young v. State*, 190 Ga. App. 775 (380 SE2d 309) (1989); *Bassett v. State*, 181 Ga. App. 597, 599 (353 SE2d 48) (1987), rev'd on other grounds, *Bassett v. Lemacks*, 258 Ga. 367 (370 SE2d 146) (1988).

[Casper:] He asked Ms. Ledford if it belonged to her, she stated no, that it did not belong to her. At that time he opened it and reached in it and at that time Ms. Ledford pushed him aside and said, "No," and grabbed the purse out of his hands.

[DA:] Did she claim ownership of the bag at any point?

[Casper:] At that point she stated it was hers.

[DA:] Was that prior to or after Agent Neville found the drugs?

[Casper:] Well, Agent — that's what I saw at that time, Agent Neville went ahead and put her in handcuffs and said, "If you'll look in the bag there's methamphetamine in there." At that time, I opened the bag. I believe there were [sic] some tissue which was wrapped around three plastic baggies of methamphetamine powder.

This is the sum total of the evidence on the issue of when the drugs were found in relation to Ledford's belated assertion of ownership. In that regard, the record shows that Agent Casper was the next person in possession of the pack after Ledford claimed ownership by grabbing it. While handcuffing Ledford, Neville directed Casper to look inside the pack because he had seen methamphetamine.[15] Casper did so. Casper then found the contraband. Absolutely no evidence shows that Neville ever had the fanny pack *back* in his possession after Ledford grabbed it. Accordingly, there is no evidence to support the trial court's conclusion that, after Ledford grabbed the pack from Neville and asserted ownership, "nevertheless, Officer Neville proceeded to search the pack." The evidence, and all reasonable inferences drawn therefrom, is that Neville saw the drugs in the pack *before* Ledford grabbed it from him, because as Casper testified, "Officer Neville was searching her purse when she grabbed for it." As such, the drugs were discovered by Neville during the time when Ledford had disclaimed ownership of the fanny pack and it was "abandoned." Ledford does not have standing to contest the search of abandoned property.[16] "[I]t is clear that none of the testimony given at the suppression hearing supports the trial court's factual determina-

---

[15] Neville's statement to Casper was admissible as original evidence under OCGA § 24-3-2. "Such testimony was admissible to explain the investigator's conduct in searching [Ledford's pack]." *Jones v. State*, 226 Ga. App. 619, 622 (4) (487 SE2d 371) (1997). In addition the statement was "relevant and admissible to establish the events leading to the arrest of [Ledford]." *Thompson v. State*, 210 Ga. App. 655, 657 (2) (436 SE2d 799) (1993); *Smith v. State*, 236 Ga. App. 122, 125 (511 SE2d 223) (1999); *McCloud v. State*, 210 Ga. App. 69, 70 (2) (435 SE2d 281) (1993); *Evans v. State*, 201 Ga. App. 20, 26 (4) (410 SE2d 146) (1991).

[16] *Orman v. State*, supra at 672; *Young v. State*, supra at 775; *Bassett v. State*, supra at 599.

tion,"[17] and thus the trial court's finding that Neville's search of Ledford's pack was improper because it was without consent is clearly erroneous.

*Judgment reversed. Blackburn, P. J., concurs. Barnes, J., concurs as to Divisions 1 (a) and 2 and concurs in judgment only as to Division 1 (b).*

DECIDED NOVEMBER 29, 2000 —
RECONSIDERATION DENIED DECEMBER 21, 2000 — 

*Lydia J. Sartain, District Attorney, Deborah R. Mitchell, Jason J. Deal, Assistant District Attorneys,* for appellant.
*Whitmer & Law, George H. Law III,* for appellee.

