## S00P1146. KING v. THE STATE.
(539 SE2d 783)

HINES, Justice.

Warren King was convicted of malice murder, armed robbery, burglary, aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony.[1] The jury fixed his sentence for the murder at death after finding the following statutory aggravating circumstances to exist: the murder was committed during the commission of the capital felony of armed robbery and during the commission of a burglary; the murder was committed for the purpose of receiving money or other things of monetary value; and the murder was committed by King as the agent of another, Walter Smith. OCGA § 17-10-30 (b) (2), (4), (6). For the reasons set forth below, this Court affirms.

1. A surveillance camera videotape and witness testimony identifying the persons recorded on the videotape showed that on the night of September 13, 1994, King and his cousin, Walter Smith, visited a convenience store in Surrency, Georgia, at approximately 10:45 p.m. Smith testified that he found King later that night and that King suggested they rob the convenience store. Smith had previously obtained a .380 caliber handgun from a relative's home, and, according to Smith's testimony, King took the handgun from the seat of Smith's vehicle and carried it with him as the two parked and walked to the convenience store.

Shortly after midnight on September 14, 2000, Karen Crosby, an employee of the convenience store, set the store's alarm, locked the door, and walked toward her automobile. King and Smith confronted her in the store's parking lot, and King ordered her at gunpoint to "give it up." Crosby recognized King and spoke to him by name.

---

[1] The crimes occurred shortly after midnight on September 14, 1994. King was indicted on October 4, 1994, by an Appling County grand jury for malice murder, armed robbery, burglary, two counts of felony murder, aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony. The State filed written notice of its intent to seek the death penalty on January 6, 1995. King's trial began on September 14, 1998, and the jury found him guilty of malice murder, armed robbery, burglary, aggravated assault, false imprisonment, and possession of a firearm during the commission of the felony of false imprisonment on September 24, 1998. On September 25, 1998, the jury fixed the sentence for the murder at death. Also on September 25, 1998, the trial court ordered the death sentence for the murder and the following consecutive prison terms for King's other crimes: life imprisonment for armed robbery; twenty years for burglary; twenty years for aggravated assault; ten years for false imprisonment; and five years for possession of a firearm during the commission of a felony. King filed a motion for a new trial on October 28, 1998, and, in an order filed on November 19, 1998, the trial court directed that the motion be deemed as timely filed. King amended his motion for new trial on November 24, 1999, and the trial court denied the amended motion in an order filed on February 7, 2000. King filed his notice of appeal on February 28, 2000. His appeal was docketed in this Court on March 29, 2000, and orally argued on July 17, 2000.

Crosby then threw her keys to Smith, who entered the convenience store as King continued to hold Crosby at gunpoint. The store's surveillance camera recorded Smith entering the store, the sounding of the store's alarm, Smith running from the store, and, approximately twenty-four seconds later, the sound of two gunshots. King testified, during the sentencing phase, that Smith yelled at him repeatedly to shoot Crosby but that he, instead, handed the gun to Smith. However, Smith testified that, as he was running from the store, he heard the two shots, turned, and saw Crosby falling to the ground. Smith also testified that, as he and King were fleeing the scene, King exclaimed, "I hope I killed the bitch."

Viewed in the light most favorable to the verdicts, this Court finds that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that King was guilty of the crimes of which he was convicted and that the aforementioned statutory aggravating circumstances existed; also, the evidence was such that a rational trier of fact would be authorized to find that King had failed to show beyond a reasonable doubt that he was mentally retarded. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Pittman v. State*, 269 Ga. 419, 420 (499 SE2d 62) (1998); OCGA §§ 17-10-30 (b) (2), (4), (6); 17-7-131 (c) (3).

### Pretrial Proceedings

2. King moved the trial court to quash his indictment because all grand jury forepersons in Appling County over a number of years have been Caucasian males. The trial court denied the motion, finding that grand jury forepersons in the county were selected by the grand jury members themselves from among their own number, that neither the district attorney nor the court participated in the selection process, and that grand jury forepersons performed duties that were essentially ministerial. These circumstances distinguish King's situation from that addressed by the United States Supreme Court in *Rose v. Mitchell*, 443 U. S. 545, 551-552 (99 SC 2993, 61 LE2d 739) (1979), and, accordingly, the trial court's refusal to quash King's indictment does not require the reversal of the verdicts reached by his traverse jury, which was properly selected. *Bishop v. State*, 268 Ga. 286, 288-289 (4) (486 SE2d 887) (1997); *Spivey v. State*, 253 Ga. 187, 199-200 (7) (b) (319 SE2d 420) (1984); see *Hobby v. United States*, 468 U. S. 339 (104 SC 3093, 82 LE2d 260) (1984).

3. King argues that the trial court erred in denying his motion to suppress statements he made to authorities during the two days following the murder. Upon a review of the record, this Court finds no error.

Before King gave his first statement on September 14, 1994, he

was told he was not under arrest, was told he could leave, was read his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and signed a waiver of those rights. After giving a statement in which he denied knowledge of the crimes, he was returned to his residence. King was arrested later that day on an unrelated warrant for aggravated assault, and he was questioned for a second time on the evening of September 15, 1994, after hearing his *Miranda* rights read again and signing another waiver of those rights. King was interviewed a third time in the early morning hours of September 16, 1994, and admitted being present during the armed robbery. Before this third interview, King once again was read his *Miranda* rights and signed a waiver of those rights. A law enforcement officer testified at the suppression hearing that King did not appear to be suffering from any mental incapacity and did not appear to be "sleepy or confused or muddled." In light of the foregoing and upon a review of the record, this Court concludes that the trial court did not err in finding that King knowingly waived his *Miranda* rights and that his statements were voluntary. *Miranda*, 384 U. S. 436; OCGA § 24-3-50.

This Court has held that *Riley v. State*, 237 Ga. 124 (226 SE2d 922) (1976), does not apply to adults. *McDade v. State*, 270 Ga. 654, 656 (3) (513 SE2d 733) (1999). Alleged cognitive impairment is one factor to be considered by a trial court as part of the totality of the circumstances surrounding a statement; however, the trial court's finding that King was capable of understanding his rights was not clearly erroneous. *Lyons v. State*, 271 Ga. 639, 640-641 (3) (522 SE2d 225) (1999); *Brown v. State*, 262 Ga. 833, 834-835 (6) (426 SE2d 559) (1993).

Investigators, who presented waiver of rights forms referring only to the robbery of the convenience store, were under no duty to inform King specifically that he was suspected of murder before accepting his signed waivers and subsequent statements. *Colorado v. Spring*, 479 U. S. 564 (107 SC 851, 93 LE2d 954) (1987); *Christenson v. State*, 261 Ga. 80, 85-86 (3) (402 SE2d 41) (1991).

Because there is no dispute that King was in custody at the time of his third statement and because King knowingly and voluntarily waived his rights, it is irrelevant that a warrant for his arrest on the charge of murder had been taken out but was not executed before he made his statement. See *United States v. Yunis*, 859 F2d 953, 966-967 (II) (B) (D.C. Cir. 1988) (pretermitting question of whether rights had attached because those rights were affirmatively waived); see also *Hodges v. State*, 265 Ga. 870, 872 (2) (463 SE2d16) (1995) ("[T]he proper inquiry is whether the individual was formally arrested or restrained to the degree associated with a formal arrest, not whether the police had probable cause to arrest.").

4. King argues that the trial court erred by denying his motion for a change of venue. King concedes that media coverage of the murder was limited, but he contends that a "small town syndrome" created strong prejudice against him.

"A capital defendant seeking a change of venue must show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of the individual jurors." *Gissendaner v. State*, 272 Ga. 704, 706 (2) (532 SE2d 677) (2000). This Court finds that King failed to make either showing and, therefore, that the trial court did not abuse its discretion in denying King's motion. *Tolver v. State*, 269 Ga. 530, 532-533 (4) (500 SE2d 563) (1998) (recognizing trial court's discretion in considering a motion for a change of venue).

The trial court denied King's motion in a detailed order following voir dire. The trial court noted its prior finding that media coverage of the murder had been "non-inflammatory" and, therefore, that it provided no basis for granting the motion. The trial court then found that, although most of the prospective jurors had heard about the murder in very general terms, "almost every juror . . . had learned more about the case during the jury selection process than they had known before they entered the courthouse." A review of the record confirms this finding of fact, and this Court approves of the trial court's legal conclusion that jurors were not unfit to serve simply because they had heard that the crimes had occurred and that King had been arrested. In fact, a review of the record reveals that a large number of the jurors knew almost nothing about the crimes and did not remember King's name. Accordingly, this Court accepts the trial court's finding that King failed to show that the trial setting was inherently prejudicial. This Court also concludes that the trial court did not err by declining to change venue when only 8.4 percent of the prospective jurors were excused because of opinions formed from their exposure to pretrial publicity and rumors, particularly in light of the soundness of the trial court's rulings on King's motions to have jurors excused for cause. See *Tharpe v. State*, 262 Ga. 110, 111 (5) (416 SE2d 78) (1992).

5. The trial court did not err by denying King's motion to have execution by electrocution declared unconstitutional. *DeYoung v. State*, 268 Ga. 780, 786 (6) (493 SE2d 157) (1997); *Wellons v. State*, 266 Ga. 77, 91 (32) (463 SE2d 868) (1995).

The trial court did not err in finding that Georgia's death penalty statutes are not unconstitutional in general and that application of the death penalty in King's specific case would not be unconstitutional. See *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987); *Zant v. Stephens*, 462 U. S. 862, 873-880 (I) (103 SC 2733, 77 LE2d 235) (1983); *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49

LE2d 859) (1976); *Gissendaner*, 272 Ga. at 716 (16); *Crowe v. State*, 265 Ga. 582, 595 (24) (458 SE2d 799) (1995).

6. King contends that this Court's review of the proportionality of death sentences is inadequate; however, as has been recently reiterated, "[t]his Court's review of death sentences is neither unconstitutional nor inadequate under Georgia statutory law." *Gissendaner*, 272 Ga. at 716 (16).

7. King contends that the district attorney's office responsible for his prosecution selects cases in which it seeks the death penalty in an unconstitutional manner. This Court has previously rejected this same argument. *Jenkins v. State*, 269 Ga. 282, 284-285 (2) (498 SE2d 502) (1998).

8. King was permitted to question jurors thoroughly after the statutory question prescribed by OCGA § 15-12-164 (a) (4) was asked, and no potential jurors were excused based solely upon their responses to that statutory question as King asserts is improperly authorized by OCGA § 15-12-164 (c). Consequently, King has no standing to challenge the constitutionality of these statutory subsections, and he can show no harm in the trial court's ruling which allowed the challenged statutory question prescribed by OCGA § 15-12-164 (a) (4) to be asked. *Jenkins*, 269 Ga. at 287 (7).

9. The trial court did not err by denying King's pretrial motion seeking authorization to make an unsworn statement or, alternatively, to testify subject to specially-limited cross-examination at trial. *Jenkins*, 269 Ga. at 294 (22); OCGA § 24-9-20 (b).

10. King sought an order from the trial court requiring the State to comply with the discovery requirements of OCGA § 17-16-1 et seq. The act of the General Assembly which is codified, in part, as OCGA § 17-16-1 et seq. states, "This Act shall become effective on January 1, 1995, and shall apply to all cases docketed on or after that date." 1994 Ga. Laws 1252, § 13. Rule 39.3 of the Uniform Superior Court Rules, which were promulgated by this Court, states that "[t]he Criminal Docket shall contain a record of all criminal indictments in which true bills are rendered. . . ." This Court concludes that King's case was "docketed" in the superior court when his true bill of indictment was recorded by that court. Because this docketing occurred before January 1, 1995, and because the State refused to consent to the application of OCGA § 17-16-1 et seq. as it could have under OCGA § 17-16-2 (d), the trial court did not err in finding that OCGA § 17-16-1 et seq. was inapplicable to King's case.

11. The trial court did not err by denying King's blanket motion for the disclosure of any psychiatric histories of the State's witnesses that might exist. King failed to show that the hypothetical records were "critical to his defense and that substantially similar evidence [was] otherwise unavailable to him" so as to penetrate the psychia-

trist-patient privilege. *Bobo v. State*, 256 Ga. 357, 360 (4) (349 SE2d 690) (1986); OCGA § 24-9-21 (5). There is also no evidence in the record that any exculpatory psychiatric evidence was withheld that was not privileged. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

12. (a) King contends that the trial court erred by denying his motion for discovery of "informal notes of law enforcement officers," of search and seizure procedures, of evidence "arguably subject to suppression," and of "any and all documents which substantiate any public statements made by the prosecutor or police official regarding [King's] case and any and all press releases made by the District Attorney during his campaign for office in the past." The trial court properly directed the State to disclose any evidence subject to disclosure under *Brady v. Maryland*, id., and performed an in camera review of the district attorney's file in King's case. King has failed to show that he was legally entitled to discovery of any other materials or to show that the State failed to follow the trial court's directive.

(b) The trial court did not err by denying King's motion for discovery of certain materials believed to be in the public record but allowing him to renew his motion if he were to "encounter difficulty in obtaining" those materials. See *Conklin v. State*, 254 Ga. 558, 566 (3) (a) (331 SE2d 532) (1985).

(c) The trial court did not err by denying King's motion to compel the State to disclose information it might have about prospective jurors. *Wansley v. State*, 256 Ga. 624, 625-626 (2) (352 SE2d 368) (1987) (holding such information is not subject to compelled discovery unless it is exculpatory and, thus, subject to *Brady v. Maryland*, 373 U. S. 83).

(d) King contends that the trial court erred by ordering him, after he had agreed to do so, to disclose to the State the materials relied upon by one of his experts in preparing a report that was, in turn, relied upon by another of his experts in rendering a professional opinion about his alleged mental retardation. This Court finds no error.

Although this Court has noted that the discovery provisions of OCGA § 17-7-211 have been repealed, their repeal is effective only with respect to cases docketed on or after January 1, 1995. 1994 Ga. Laws 1252, § 13 ("This Act shall become effective on January 1, 1995, and shall apply to all cases docketed on or after that date."); see *State v. Lucious*, 271 Ga. 361 (518 SE2d 677) (1999). Because King's case was docketed before that date, the discovery rules in place prior to the Act apply.

This Court held in *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994), that the State is entitled to discovery of expert reports only to the extent that the State's discovery would be reciprocal to the dis-

covery to which defendants are entitled under OCGA § 17-7-211. *Rower*, 264 Ga. at 324-325 (5). Because this Court has held that a defendant is entitled to discover expert reports and other forms of data relied upon by the State's experts in forming the opinions they will testify about, the State's reciprocal right of discovery would also include such materials. See *Eason v. State*, 260 Ga. 445 (396 SE2d 492) (1990); *Lucious*, 271 Ga. at 365 (4) (b) (holding that *Eason*'s requirements were "derived from former OCGA § 17-7-211"). Pretermitting the State's contention that King acquiesced in the trial court's ruling, this Court holds that the State was entitled to discover the contested materials.

13. A review of both the sealed and unsealed portions of the record reveals no support for King's suggestion that the trial court's in camera review and disclosure of exculpatory documents was inadequate. The transcript suggests in a number of places that King had possession of the arguably-exculpatory portions of the sealed record. See *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972); *Brady*, 373 U. S. 83.

14. (a) The trial court did not err by denying King's pre-trial motion regarding voir dire and ordering, instead, that it would "bring in small panels for general voir dire, restrict possible responses which might bias the panel to a showing of hands, and permit individual follow up voir dire." *Lynd v. State*, 262 Ga. 58, 59 (2) (414 SE2d 5) (1992); *State v. Hutter*, 251 Ga. 615 (307 SE2d 910) (1983).

(b) The trial court did not abuse its discretion in denying King's motion seeking to have a questionnaire sent to prospective jurors in advance of their in-court voir dire. *Jones v. State*, 263 Ga. 904, 907 (9) (b) (440 SE2d 161) (1994).

(c) The trial court did not abuse its discretion in denying King's motion for additional peremptory strikes. *Frazier v. State*, 257 Ga. 690, 695 (10) (362 SE2d 351) (1987).

15. King contends that the trial court acted improperly by conducting a brief hearing outside his presence concerning the State's request for an order compelling Walter Smith to testify in King's trial and confirming the use and derivative use immunity that would apply to that compelled testimony. See OCGA § 24-9-28. A criminal defendant has the right to be present during all portions of his or her trial, and a defendant's absence during a critical stage of those trial proceedings, absent a waiver of the defendant's right to be present, is not subject to harmless error analysis. *Holsey v. State*, 271 Ga. 856, 860-861 (5) (524 SE2d 473) (1999). The hearing in question, however, appears not to have been a part of the proceedings against King. While King might have preferred that a key witness not be ordered to testify truthfully in his trial, there is nothing in Georgia law that would have permitted him to object to the State's request for the

order or that would suggest that King's rights were the subject matter under consideration. See *Williams v. State*, 234 Ga. App. 191, 193-194 (2) (b) (506 SE2d 237) (1998). On the contrary, the trial court was obliged to consider whether the testimony was "necessary to the public interest," a matter which King had no standing to address. OCGA § 24-9-28 (a). King was placed on sufficient notice that Smith had been ordered to testify and that his testimony could not later be used against him. Any alleged bias on the witness's part was the proper subject of cross-examination, not grounds for denying the State's request for the order. See *Mosher v. State*, 265 Ga. 666, 667 (461 SE2d 219) (1995) (holding that the credibility of a witness ordered to testify under OCGA § 24-9-28 is a jury question).

16. King has failed to show a violation of any of his legal rights by the State's decision to prosecute him before Walter Smith. See OCGA § 17-8-4 ("When separate trials are ordered in any case, the defendants shall be tried in the order requested by the state.").

17. The trial court did not err by denying King's pre-trial motions seeking authorization to present evidence about the alleged lack of deterrent effect of the death penalty, about the effects of electrocution, about alleged lingering doubt surrounding other persons' convictions, and about life imprisonment in general. *Barnes v. State*, 269 Ga. 345, 359-360 (27) (496 SE2d 674) (1998). The trial court did authorize King to introduce evidence relevant to his own "background and character" as this Court has required. Id. at 360.

## *Guilt-Innocence Phase*

18. King contends that the trial court erred by failing to excuse certain jurors based on their alleged unwillingness to consider mitigating evidence and a sentence other than death. The core question where a juror's views about the death penalty are the subject of a motion to have the juror stricken for cause is whether the juror's views would " 'prevent or substantially impair . . . his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.' " *Greene v. State*, 268 Ga. 47, 48-50 (485 SE2d 741) (1997) (quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985)); see also *Waldrip v. State*, 267 Ga. 739, 743-744 (8) (a) (482 SE2d 299) (1997). Upon a review of the record, this Court finds that the trial court did not abuse its discretion by finding the challenged jurors qualified to serve.

(a) Juror Hardee repeatedly answered affirmatively in response to the trial court's extensive questioning about whether he would consider mitigating circumstances with "a genuine openness to being convinced that they might make life imprisonment a more appropriate punishment." The juror also answered that he would not "start

out with a predisposition" toward the death penalty. Only when defense counsel improperly questioned the juror about what sentence the juror might choose under the specific, hypothetical circumstance where "somebody intentionally killed somebody for money and it wasn't self-defense, it wasn't [an] accident, and it wasn't justifiable" did the juror state that he would consider life imprisonment only as a harsher alternative to the death penalty. *Gissendaner*, 272 Ga. at 707-708 (3) (b); *Blankenship v. State*, 258 Ga. 43, 45 (6) (365 SE2d 265) (1988). The trial judge, who was present and able to observe the demeanor and voice inflection of counsel and the juror, noted that defense counsel's questioning "implied that there were no mitigating circumstances." Viewing the juror's responses as a whole, this Court finds that the trial court did not abuse its discretion in denying King's motion to have the juror stricken for cause. *Greene*, 268 Ga. at 50.

(b) Juror Norris gave some responses during questioning by defense counsel which suggested he would likely give little or no weight to certain hypothetical mitigation evidence. However, the juror also answered repeatedly that he would listen to all of the evidence presented to him and allow it the opportunity to sway him. Although the juror's responses suggested that he would be more influenced by evidence pertaining to the actual crimes and "the reason given why it happened" than by other evidence, his responses showed a willingness to listen to the defendant's mitigation evidence in general and to meaningfully consider a sentence other than death. This Court finds no abuse of discretion in the trial court's determination that the juror was qualified to serve. Id.

(c) A review of the record suggests that a number of juror Drew's responses concerning mitigating evidence were affected by her apparent confusion about the meaning of the word "sentence." Her confusion is made most plain by her attempt to question defense counsel whether he was referring to "an actual sentence guilty or innocent. . . ." A number of the juror's other responses, however, clearly indicated her willingness to consider mitigating evidence and a sentence less than death. This Court finds that her responses, viewed as a whole, amply supported the trial court's exercise of discretion in finding her qualified to serve. Id.

(d) Juror Hipps's responses clearly showed that she would consider mitigation evidence and a sentence less than death. In fact, when defense counsel improperly questioned the juror about what weight she would give to specific, hypothetical evidence, she answered that she might give significant weight to a number of those evidentiary items. Although the juror stated that a person convicted of murder should "pay for it if it's done intentionally," she explained that she "would still have to hear the evidence" before she could state

what an appropriate sentence would be. This Court finds no abuse of discretion in the trial court's finding her qualified to serve. Id.

(e) Under improper questioning seeking to find what weight she would give to specific, hypothetical mitigating circumstances, juror Vaughn stated that she would give weight to some but probably not to others. The juror later stated that she would attempt to consider all of the evidence that might be presented "with a genuine openness" and would meaningfully consider a sentence less than death. This Court finds that the trial court did not abuse its discretion in finding her qualified to serve. Id.

19. King contends that the trial court erred by excusing certain jurors for cause based on their personal views in opposition to the death penalty and their inability to meaningfully consider it as a sentencing option. This Court finds that the trial court did not abuse its discretion in its rulings. Id.

(a) Juror Wilkerson stated that his opposition to the death penalty was so strong that it might affect his ability to render a correct verdict even during the guilt-innocence phase of King's trial. He also stated quite clearly that he could never cast a vote in favor of the death penalty during jury deliberations. This Court finds no abuse of discretion in the trial court's excusing the juror for cause. Id.

(b) Juror Fuller indicated that he believed he would automatically vote against the death penalty during jury deliberations. He indicated that he might tend to favor the death penalty if one of his own close family members were murdered, particularly in the heat of the moment, but he stated repeatedly that he was "firmly" opposed to the death penalty in all other situations. This Court finds that the trial court did not abuse its discretion in excusing the juror for cause. Id.

(c) The trial court did not abuse its discretion in excusing jurors Richard McCall, Ernestine James, and Eddie Vann, who all made clear that they were unable or unwilling to consider the death penalty as a sentencing option. Id.

20. There is no violation of the constitutional right to freedom of religion and conscience where a juror is stricken for cause based upon death penalty views that are derived from religion. *Cromartie v. State*, 270 Ga. 780, 785 (11) (514 SE2d 205) (1999) ("The standard for excusing a prospective juror based upon the prospective juror's views on the death penalty draws no religious or secular distinction.").

21. Upon a review of the record, this Court concludes that there is no merit to King's contention that the trial court conducted voir dire in an unfair or biased manner. See *Ledford v. State*, 264 Ga. 60, 64 (6) (c) (439 SE2d 917) (1994).

22. King moved the trial court to consider whether the State had engaged in race and gender discrimination in the exercise of its per-

emptory jury strikes. See *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986); *J.E.B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994). The trial court found that King had made a prima facie showing of discrimination and required the State to explain the reasons for the challenged strikes. The trial court found the State's reason for striking juror Alderman to be insufficient to rebut the prima facie showing of discrimination and ordered her reinstated in a manner agreed upon by the parties. This Court finds that the trial court did not abuse its discretion in finding that King failed to carry his burden of persuasion as to the jurors challenged in this appeal. See *Barnes*, 269 Ga. at 349-351 (6); *Turner v. State*, 267 Ga. 149, 150-153 (2) (476 SE2d 252) (1996) (setting out proper procedure for evaluating claims of discrimination in use of peremptory strikes and holding that trial court's findings are "entitled to great deference and will be affirmed unless clearly erroneous.").

(a) The State explained that it had stricken juror Burkett because she knew King's family and because she was the minister of a church. The State explained its preference that ministers not serve as jurors by stating that ministers "have a particular point of view about trying to forgive people and look to the best in them." A review of the record reveals that the State consistently questioned male and female jurors of all races during voir dire about the roles they served in their places of worship and that none of the other prospective jurors were ministers, factors that support the State's contention that its explanation was not pretextual. A review of the record also confirms that juror Burkett stated that she knew King's family, a factor that was not unique to the juror but which the State was permitted to consider as part of its final decision to strike the juror. This Court finds that the trial court did not abuse its discretion in finding no discrimination. Id.

(b) The State explained that it had stricken juror Maurice Vann because his responses regarding the death penalty had been "50-50" and because he had stated that he knew King's family. During voir dire, the juror requested on his own initiative that he be dismissed from the jury because of his connection to King's family, explaining that considering the death penalty for King would be difficult for him. King's contention that the juror was mistaken about which, if any, of King's family members the juror knew is of little import, because a juror's belief of a fact need not be correct to influence his or her deliberations. This Court finds that the trial court did not abuse its discretion in finding no discrimination. Id.

(c) The State explained that it had stricken juror Sarah McCall because she had stated that the death penalty was not her "first choice" and because her husband, who was also a prospective juror, had stated during his voir dire that she was opposed to the death

penalty. The assistant district attorney was mistaken in his recollection of Richard McCall's voir dire, but this mistake does not show that the explanation was a mere pretext. *Smith v. State*, 264 Ga. 449, 453 (4) (448 SE2d 179) (1994) (holding that a reason for a strike may be mistaken so long as it is race-neutral). This Court finds that the trial court did not abuse its discretion in finding no discrimination. *Barnes*, 269 Ga. at 349-351 (6); *Turner*, 267 Ga. at 150-153 (2).

(d) The State explained that it had stricken juror Dean because the victim's brother, a potential witness, had previously shot the juror's stepson. The trial court did not err by allowing the State to rely on information not derived from voir dire questioning which was gender neutral. *Barnes*, 269 Ga. at 350-351 (6). The juror's responses during voir dire did not significantly undermine the State's factual assertion about the shooting, and nothing in the record suggests that the assistant district attorney was being untruthful. This Court finds that the trial court did not abuse its discretion in finding no discrimination. *Barnes*, 269 Ga. at 349-351 (6); *Turner*, 267 Ga. at 150-153 (2).

(e) The State explained that it had stricken juror Ford because she was a single mother who would be financially burdened by jury service and because of "her relationship with [mentally retarded] kids at school." Although seven other jurors, four of them women and one an African-American male, described some exposure to mentally retarded persons, the State explained that juror Ford "was the only person who indicated that she enjoyed that relationship." This Court finds that the trial court did not abuse its discretion in finding no discrimination. Id.

(f) The State explained that it had stricken juror Gillis in order to reach the next juror in the panel of prospective alternate jurors, an African-American male, and because juror Gillis had stated that she was a neighbor of both King's aunt and of King's co-indictee's uncle, the owner of the murder weapon. Pretermitting the State's argument that any error was harmless because no alternate jurors participated in deliberations, this Court finds that the trial court did not abuse its discretion in accepting the State's explanations. Although " '[m]ere place of residence or any other factor closely related to race' " cannot by itself serve as the basis for explaining a challenged peremptory strike, juror Gillis was shown to have specific personal acquaintances that might have tended to make her sympathetic to the defense. *Congdon v. State*, 262 Ga. 683 (424 SE2d 630) (1993) (quoting *Lynn v. Alabama*, 493 U. S. 945, 947 (110 SC 351, 107 LE2d 338) (1989) (Marshall, J., dissenting)). This Court has carefully noted King's argument that other jurors who knew him or members of his family were not stricken by the State, but, as with juror Burkett, the State's argument that other factors, which did not apply to those other

jurors, contributed to its final decision to strike juror Gillis was credible. Accordingly, this Court finds that the trial court did not abuse its discretion in finding no discrimination. *Barnes,* 269 Ga. at 349-351 (6); *Turner,* 267 Ga. at 150-153 (2).

23. King contends that the trial court erred by declining to strike jurors Folsom and Strickland based upon their familiarity with the victim's young child and juror Reddy (formerly Smith) based upon the fact that she had attended school with the victim. Jurors need only be excused for cause based on their relationship to a victim when it appears that they cannot or will not "put aside [the] relationship with the victim . . . and render impartial verdicts based solely on the evidence." *Mosley v. State,* 269 Ga. 17, 19-20 (2) (495 SE2d 9) (1998). This is a mixed question of law and fact, and a trial court's findings regarding a juror's ability to put aside his or her relationship with the victim will be reversed only if they appear to be an abuse of discretion. Id.; see also *Irvin v. Dowd,* 366 U. S. 717 (81 SC 1639, 6 LE2d 751) (1961).

(a) Juror Folsom had counseled the victim's child while the child was in kindergarten, but the juror, whom the trial court found to be "very honest," stated that she did not believe her past relationship to the child would affect her decisions as a juror. This Court finds that the trial court did not abuse its discretion by denying King's motion to have the juror stricken for cause. Id.

(b) Juror Strickland had worked at the school attended by the victim's daughter. Her responses, read together, suggest that she knew who the daughter was but was not well-acquainted with her. The juror stated that she had formed no opinions regarding King's guilt or regarding what a proper sentence might be for the murder. Although she later volunteered that the victim's daughter "might enter into [her] mind," she immediately added that she understood that her proper focus would be the defendant and the evidence. This Court finds no abuse of discretion in the trial court's denying King's motion to have her stricken for cause. Id.

(c) Juror Reddy stated that she had attended school with the victim, but she also stated the following: "[W]e had a class together, but that's the extent of it." This Court finds no abuse of discretion in the trial court's refusal to strike this juror for cause. Id.

24. Juror Arnold revealed during her voir dire that her husband had served as the foreman of the grand jury that indicted King. The juror made clear that she had learned nothing from her husband at the time of his service other than King's name. The juror also revealed that she had told her husband the name of the case she had been called for as a prospective juror, and that her husband had told her that she should inform the trial judge that he had "signed that paper," referring to the indictment. The juror stated plainly that she

and her husband had no other discussions about King's case and that she had not formed any opinions.

Although the trial court had instructed the prospective jurors not to discuss the case with anyone while awaiting voir dire, this Court does not agree with King's contention that juror Arnold's simply informing her husband of the name of the case in which she had been called was juror misconduct requiring a presumption of harm. Compare *Lamons v. State*, 255 Ga. 511 (340 SE2d 183) (1986). The juror was entirely forthright about her brief conversation with her husband, had learned nothing from him that would seem likely to affect her, and stated specifically that she had formed no opinions. Compare *Logue v. State*, 155 Ga. App. 476 (271 SE2d 42) (1980) (reversing where juror was related to a grand jury member and stated consistently that "she would be inclined toward the prosecution"). In light of the circumstances, this Court finds no abuse of discretion in the trial court's denying the motion to have her stricken for cause.

25. Juror Reddy (formerly Smith) responded affirmatively when asked if she had ever observed racial discrimination. The juror then responded affirmatively when asked if the discrimination had "bother[ed]" her. When King then attempted to ask an additional question about whether the juror had attempted to "intercede for" the person discriminated against, the trial court sustained an objection by the State.

Although a criminal defendant in an interracial murder case certainly has the right to inquire into the possible racial biases of jurors, a trial court "retains discretion as to the form and number of questions on the subject. . . ." *Turner v. Murray*, 476 U. S. 28, 37 (III) (106 SC 1683, 90 LE2d 27) (1986); see also *Legare v. State*, 256 Ga. 302, 303-304 (1) (348 SE2d 881) (1986). Because King was allowed to ask questions regarding possible bias to juror Reddy and all other jurors and because King's initial questions to juror Reddy had revealed no compelling reason for continued questioning of her on the subject, this Court finds no abuse of the trial court's discretion in sustaining the State's objection.

26. The trial court did not err by sustaining the State's objections to King's apparent effort to have jurors Drew and Hipps enumerate the mitigating circumstances they would give weight to. *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997) ("[I]t is improper to require [a] juror to enumerate hypothetical circumstances in which she [or he] might or might not vote to impose the death penalty."). This Court finds no error in the trial court's limitation of King's questioning of juror Kimberly and further notes that, because the juror was excused for cause upon King's motion, any alleged error would have been rendered harmless.

27. The trial court did not err by charging the jury that they were authorized to find King "guilty but mentally retarded" if they "believe[d] beyond a reasonable doubt that [he was] guilty and was mentally retarded at the time of the commission of the offense. . . ." See OCGA § 17-7-131 (c) (3). The trial court also did not err by conducting the proceedings on King's alleged mental retardation during the guilt-innocence phase of his trial. Neither the procedure nor the burden of proof established by OCGA § 17-7-131 (c) (3) is unconstitutional. *Palmer v. State*, 271 Ga. 234, 237 (3) (517 SE2d 502) (1999); *Burgess v. State*, 264 Ga. 777, 789-791 (36) (450 SE2d 680) (1994)

> ("[I]t is clear that the intent of [*Fleming v. Zant*, 259 Ga. 687 (386 SE2d 339) (1989), and its progeny] was to give the defendants therein 'essentially the same opportunity to litigate the issue of [their] mental retardation as [they] would have had if the case[s] were tried today, with the benefit of the OCGA § 17-7-131 (j) death-penalty preclusion.' ")

(quoting *Zant v. Foster*, 261 Ga. 450, 451 (4) (406 SE2d 74) (1991)).

28. King contends that the trial court committed reversible error by not preventing the State from arguing that King's claim of mental retardation was an attempt at "putting responsibility somewhere else" and avoiding the death penalty. The record reveals that King made one successful objection to the State's argument, contending that the State had improperly suggested that a finding of mental retardation would require the jury to find him not guilty. The State later continued to argue without objection that King's allegation of mental retardation was an attempt to avoid a finding of guilt. In the same vein, the State recounted the testimony of Dr. Dickinson where he, first on direct examination and later on cross-examination, stated that King might have been motivated to malinger during his mental evaluation in order to avoid the death penalty.

This Court held in *State v. Patillo*, 262 Ga. 259 (417 SE2d 139) (1992), that a jury should not be informed that a finding of mental retardation bars the imposition of the death penalty. However, the State's arguments about King's attempt to place responsibility somewhere else and to avoid the death penalty were directed not at the question of whether a finding of mental retardation would bar the imposition of the death penalty but, rather, toward King's argument to the jury that his alleged mental retardation suggested he was not capable of committing the crimes of which he was accused. In this particular circumstance, we find that the argument was not improper.

29. The trial court did not err by denying King's motion for a directed verdict on the issue of mental retardation, because the evi-

dence was in conflict as to the questions of King's "intellectual functioning," his alleged "impairments in adaptive behavior," and his alleged malingering during his examinations by experts. *Jenkins*, 269 Ga. at 291 (15); OCGA §§ 17-7-131 (a) (3); 17-9-1 (a).

30. During its cross-examination, the State questioned one of King's expert witnesses about whether the witness had a "complaint for having sex with one of [his] patients . . . presently pending against [him]." The State then attempted to question the witness about scheduled hearings concerning the complaint that the witness had delayed for health reasons. King objected to the line of questioning and the jury was removed from the courtroom. The State argued that it was entitled to question the witness about the complaint in order to show that the witness's professional credentials were in jeopardy and in order to show alleged bias in his willingness to appear at King's trial for a fee when he had previously claimed he was physically incapable of attending hearings concerning the complaint against him. The trial court ruled the questioning improper and gave a strongly-worded curative instruction. King argues that the curative instruction was insufficient and, therefore, that his renewed motion for a mistrial was erroneously denied.

This Court first addresses whether the State's questioning was improper. "[I]mpeaching a witness with specific acts of bad character is not permissible," *Pruitt v. State*, 270 Ga. 745, 754 (21) (514 SE2d 639) (1999), and the State acknowledged that it had no evidence of criminal convictions that might serve as the proper basis for impeachment. See OCGA § 24-9-84; *Vincent v. State*, 264 Ga. 234-235 (442 SE2d 748) (1994) (quoting *McCarty v. State*, 139 Ga. App. 101, 102 (227 SE2d 898) (1976) (setting forth permissible methods of impeaching a witness)). The State urged that it was entitled to question the witness about the complaint in order to show the weakness of his professional credentials, but the witness's professional license was valid and the complaint against the witness bore no relation to the scientific issues about which he testified at trial. The State's other purported purpose in the questioning, that of showing bias from the witness's willingness to appear at trial for a fee when he had failed to appear at other hearings concerning the professional complaint against him, was only marginally relevant and failed to justify the introduction of the irrelevant and potentially prejudicial matter of alleged sexual misconduct. This Court notes that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." (Punctuation omitted.) *Hicks v. State*, 256 Ga. 715, 720 (13) (352 SE2d 762) (1987). The prejudicial aspects of the questioning should have been plain to the State, and parallel lines of questioning were available that would have served the same purpose. This Court finds, therefore, that the

trial court correctly found the questioning to be improper.

OCGA § 17-8-75 requires a trial court's action where counsel "make statements of prejudicial matters which are not in evidence" and an objection is raised, and this Court has held that the statute forbids the State's introduction of prejudicial matters by its questioning of witnesses. *Castell v. State*, 250 Ga. 776, 789 (8) (301 SE2d 234) (1983). But this Court has further held the following:

> Where, as here, counsel has made statements regarding prejudicial matters not in evidence before the jury, OCGA § 17-8-75 provides the trial court with discretion to order a mistrial. His [or her] refusal to do so, coupled with appropriate curative instructions and admonishment of state's counsel, absent manifest abuse, will not be reversed.

*Schirato v. State*, 260 Ga. 170, 171-172 (4) (391 SE2d 116) (1990) (citing *Welch v. State*, 251 Ga. 197, 200 (6) (304 SE2d 391) (1983)); see also *Wilson v. State*, 271 Ga. 811, 819 (13) (525 SE2d 339) (1999). In this case, the trial court's curative instructions included a statement that the questioning was improper, a statement that the jury must disregard the question, and a statement concerning the unreliability of an unsubstantiated ethical complaint filed by a person under psychiatric treatment. In light of the strong curative instruction given, this Court finds that the trial court's refusal to grant a mistrial was not a manifest abuse of discretion.

31. The trial court did not err by sustaining the State's objection when King attempted to ask Walter Smith, King's co-indictee, why he had left high school in the tenth grade. A defendant's right to a "thorough and sifting cross examination" is not violated by a trial court's confining questioning to relevant, material matters, and "the trial court, in determining the scope of relevant cross-examination, has a broad discretion." *Kolokouris v. State*, 271 Ga. 597, 600 (4) (523 SE2d 311) (1999) (applying both constitutional and statutory requirements); OCGA § 24-9-64. This Court finds that the question's bearing upon the ultimate question in the guilt-innocence phase of whether King, who had been holding the murder weapon seconds before the victim's death, was legally culpable for her death was too remote to now justify interference with the trial court's broad discretion.

32. The trial court did not err by restricting argumentative questioning by defense counsel. *Beadles v. State*, 259 Ga. 519, 524 (3) (385 SE2d 76) (1989).

33. The pattern charge on reasonable doubt given by the trial court was not improper and would not have misled the jury as to their duty to apply the correct standard of proof. Compare *Cage v. Louisiana*, 498 U. S. 39 (111 SC 328, 112 LE2d 339) (1990).

*Sentencing Phase*

34. King contends that the trial court erred by sustaining an objection to a question his counsel asked which sought more detail about "problems" King's foster mother had had with her other foster children prior to King's second stay with her. Because the witness had already testified that King had not caused problems during his first stay with her when the other children were not there, because she had already testified in general terms that the other children had caused problems prior to King's second stay with her, and because King was later permitted to question the witness more directly about whether King had been a follower or a leader when he and the other children fell into trouble together, this Court concludes that the trial court did not abuse its discretion in sustaining the State's objection. *Kolokouris*, 271 Ga. at 600 (4).

35. At the conclusion of King's sentencing phase closing argument, defense counsel urged the members of the jury to consider a sentence less than death by stating, "[A]sk yourself what Jesus would do." The trial court sustained the State's objection to the argument and instructed the jury to disregard the comment after concluding that it called upon the jury "to put themselves in a [position] to be judged by God." The trial court's ruling did not forbid counsel's arguing in favor of mercy in other ways. This Court finds no reversible error.

This Court has held that "it would be improper . . . to urge that the teachings of a particular religion command the imposition of a death penalty in the case at hand." *Hill v. State*, 263 Ga. 37, 45 (19) (427 SE2d 770) (1993). Accordingly, this Court reversed a death sentence where the State argued that biblical law required the death penalty for murder, holding, "Language of command and obligation from a source other than Georgia law should not be presented to a jury." *Carruthers v. State*, 272 Ga. 306, 310 (2) (528 SE2d 217) (2000). The same general standard should apply to defendants as applies to the State, and, accordingly, defense counsel should not argue that a particular religion requires the imposition of a sentence other than death.

This Court has acknowledged that "[i]t is difficult to draw a precise line between religious arguments that are acceptable and those that are objectionable. . . ." Id. In light of this difficulty, some discretion must be afforded to trial courts in determining whether a particular argument, whether made by the State or by a defendant, tends to urge jurors' compliance with some religious mandate in potential exclusion of their duty to consider all applicable sentencing alternatives. This Court finds that the trial court did not exceed this limited discretion in evaluating King's argument about what Jesus might do.

36. This Court finds that the trial court's charge to the jury at the conclusion of the sentencing phase which instructed the jury to "consider the facts and circumstances, if any, in extenuation, mitigation, and/or aggravation" was not rendered confusing or misleading by the trial court's earlier charge at the conclusion of the guilt-innocence phase describing the requisite mens rea for malice murder as "the unlawful intention to kill without justification, excuse, or mitigation." In context, the two uses of the word "mitigation" would have been understood and applied appropriately in each of the two phases of King's trial. This is particularly true because the trial court charged the jury on the definition of the word "mitigation" to be applied during the sentencing phase.

37. King has failed to show that the trial court committed reversible error in presenting statutory aggravating circumstances to the jury for its consideration.

(a) This Court does not agree with King's contention that OCGA § 17-10-30 (b) (2) fails to narrow the class of persons eligible for the death penalty because it authorizes that sentence whenever a murder was committed during a burglary. See *Ford v. State*, 257 Ga. 461, 462-464 (1) (360 SE2d 258) (1987).

(b) The trial court did not err by submitting to the jury both the statutory aggravating circumstance referring to armed robbery and the statutory aggravating circumstance referring to murder "for the purpose of receiving money or any other thing of monetary value. . . ." *Simpkins v. State*, 268 Ga. 219, 220-223 (2) (486 SE2d 883) (1997); see OCGA § 17-10-30 (b) (2), (4).

(c) This Court finds that there was evidence to support a finding that King "committed murder as an agent . . . of another" and, therefore, that the trial court did not err in presenting that statutory aggravating circumstance to the jury for its consideration. OCGA § 17-10-30 (b) (6).

(d) This Court agrees with King's contention that OCGA § 17-10-30 (b) (2) sets forth only one statutory aggravating circumstance which exists if the offender committed a murder while "engaged in the commission of" either one or more of certain enumerated crimes. OCGA § 17-10-30 (b) (2); see *Carruthers*, 272 Ga. at 311 (3) (b). However, this Court concludes that any error in presenting the jury with two separate findings to consider, one that the murder was committed during a burglary and the other that the murder was committed during an armed robbery, was harmless because the death penalty would still have been authorized if the two overlapping findings had been merged and because the jury was not instructed to weigh the number of statutory aggravating circumstances but, instead, was properly charged that it could impose a sentence less than death for any or no reason. See *Pace v. State*, 271 Ga. 829, 845 (33) (524 SE2d

490) (1999); *Moore v. State*, 240 Ga. 807, 822 (III) (2) (243 SE2d 1) (1978).

38. OCGA § 17-10-2 (c) states that the jury in a death penalty trial "shall retire to determine whether any mitigating or aggravating circumstances . . . exist and whether to recommend mercy for the defendant." We find that this language does not prescribe any specific jury charge. Rather, as the statute specifically states, the trial "judge shall give the jury *appropriate* instructions. . . ." (Emphasis supplied.) OCGA § 17-10-2 (c). This Court finds that the trial court's charge to the jury, which stressed that they should consider any mitigating evidence and that they could impose a sentence less than death for any or no reason, was an appropriate instruction that sufficiently informed the jury of its relevant duties in deciding King's sentence.

39. The trial court did not err by declining to charge the jury on the specific mitigating circumstance of residual doubt but, instead, charging the jury on mitigating circumstances in general. *Carruthers*, 272 Ga. at 317 (18); *Johnson v. State*, 271 Ga. 375, 385 (17) (519 SE2d 221) (1999); *Jenkins*, 269 Ga. at 296 (25).

40. The trial court's instructions on mitigating and aggravating circumstances and on the jury's duties in deciding King's sentence were adequate, and it was not error for the trial court to refuse to charge the jury in the exact language requested. *Massey v. State*, 270 Ga. 76, 78 (4) (c) (508 SE2d 149) (1998) ("It is axiomatic that a trial court does not err in refusing to give a requested instruction in the exact language requested where the charges given in their totality substantially and adequately cover the principles contained in the requested charge."); *Kelly v. State*, 241 Ga. 190, 191-192 (4) (243 SE2d 857) (1978).

41. A trial court is not required to charge a jury on the consequences of the jury's failure to reach a unanimous verdict. *Burgess*, 264 Ga. at 789 (35).

### Sentence Review

42. This Court finds that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

43. King contends that the death penalty in his case is disproportionate to the sentences imposed in other, unspecified cases in Georgia where murder was committed under similar circumstances, because his co-indictee has not yet been tried and sentenced for the murder, and because he is allegedly mentally retarded.

Although King suggests that this murder during the commission of an armed robbery and a burglary is similar to cases in Georgia

where the death penalty has not been imposed,

> our review concerns whether the death penalty "is excessive per se" or if the death penalty is "only rarely imposed . . . or substantially out of line" for the type of crime involved and not whether there *ever* have been sentences less than death imposed for similar crimes.

(Citations omitted; emphasis in original.) *Gissendaner*, 272 Ga. at 717 (19) (a).

This Court also is not persuaded that King's death sentence should be overturned because his co-indictee has not yet been sentenced and, according to King's argument, is not likely to be sentenced to death. Although King argues he was less culpable than Smith, we note that the jury had before it sufficient evidence to authorize it to conclude that King was involved in planning the armed robbery and burglary, that King had carried the handgun to the crime scene, that King had actually fired the shots from the handgun, and that King had shown a complete lack of remorse by his statement that he hoped he killed the victim. See also *Waldrip*, 267 Ga. at 752-753 (25) (finding that death sentence was not disproportionate where jury was authorized by the evidence to conclude that the defendant was more culpable than his co-indictees who received life sentences). This Court also notes that the jury was authorized to credit the State's argument at trial that King's allowing himself to be identified by the victim, who knew him and addressed him by name, suggested that he intended to murder her from the beginning. *Ross v. State*, 233 Ga. 361, 366-367 (2) (211 SE2d 356) (1975) ("It is the reaction of the sentencer to the evidence before it which concerns this court and which defines the limits which sentencers in past cases have tolerated. . . .").

Although this Court's sentence review includes consideration of the particular characteristics of the defendant, see *Corn v. State*, 240 Ga. 130, 141 (III) (2) (c) (240 SE2d 694) (1977) (discussing "low mental level and social maladjustment"), this Court looks to the evidence presented at trial and the reasonableness of the jury's reaction to that evidence for its guidance, not bare allegations. As stated above, this Court finds that the evidence concerning King's alleged mental retardation was such that the jury was authorized to find that King had failed to prove beyond a reasonable doubt during the guilt-innocence phase that he was mentally retarded. The jury was also asked by defense counsel to consider King's mental capabilities during the sentencing phase in deciding his sentence, and, in fact, the jury was able to hear his testimony and observe his demeanor prior to fixing his sentence. This Court finds that the evidence of

King's alleged mental deficiencies was not sufficient to compel a finding by this Court that the jury's sentence of death was "excessive."

For the reasons detailed above, this Court concludes, considering both the crime and the defendant, that the death penalty in King's case was neither excessive nor disproportionate to the penalties imposed in similar cases in this State. OCGA § 17-10-35 (c) (3). The cases appearing in the Appendix support this conclusion in that each involved an intentional killing during the commission of an armed robbery or a burglary.

*Judgment affirmed. All the Justices concur except Fletcher, P. J., who dissents, and Benham, C. J., and Sears, J., who concur in part and dissent in part.*

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, due to the concerns I expressed in my partial dissent to *Wilson v. State*,[2] I dissent to Division 5 of the majority opinion and to the affirmance of appellant's death sentence only to the extent it requires execution by means of electrocution.

I am authorized to state that Chief Justice Benham joins me in this partial concurrence and partial dissent.

FLETCHER, Presiding Justice, dissenting.

For the reasons stated in my dissent in *Jenkins v. State*[3] I believe that it is unconstitutional to require a capital defendant to establish mental retardation beyond a reasonable doubt during the guilt/innocence phase. The difficulties inherent in the procedure are apparent in this case. The state's argument that King was using mental retardation as a way to escape responsibility and avoid the death penalty was subject to two interpretations, both improper. The state's suggestion that a finding of mental retardation required a not guilty verdict was wrong legally and the trial court properly sustained the argument. The other interpretation is also impermissible – that a finding of mental retardation would bar the imposition of the death penalty.[4] Therefore, I conclude that the state's argument was improper.

I also conclude that the trial court erred in charging the jury on both the statutory aggravating circumstances of armed robbery and murder for the purpose of receiving money because the two circumstances refer to identical aspects of the crime.[5]

---

[2] 271 Ga. 811 (525 SE2d 339) (1999).
[3] 269 Ga. 282, 298 (498 SE2d 502) (1998).
[4] See *State v. Patillo*, 262 Ga. 259 (417 SE2d 139) (1992).
[5] *Simpkins v. State*, 268 Ga. 219, 223 (486 SE2d 833) (1997) (Fletcher, P. J., concurring specially).

APPENDIX.

*Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Whatley v. State*, 270 Ga. 296 (509 SE2d 45) (1998); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Thomason v. State*, 268 Ga. 298 (486 SE2d 861) (1997); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996); *Greene v. State*, 266 Ga. 439 (469 SE2d 129) (1996); *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Christenson v. State*, 262 Ga. 638 (423 SE2d 252) (1992); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Davis v. State*, 255 Ga. 588 (340 SE2d 862) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Horton v. State*, 249 Ga. 871 (295 SE2d 281) (1982).

DECIDED NOVEMBER 30, 2000 —
RECONSIDERATION DENIED DECEMBER 15, 2000.

*Jackson & Schiavone, George T. Jackson, Steven L. Sparger, George B. Hagood*, for appellant.
*Stephen D. Kelley, District Attorney, John B. Johnson III, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Vrolijk, Assistant Attorney General*, for appellee.